

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*United States District Courthouse*
*300 Quarropas Street*
*White Plains, New York 10601*

September 27, 2021

**BY ECF**
The Honorable Vincent L. Briccetti
United States District Court
Southern District of New York
300 Quarropas Street
White Plains, New York 10601

     Re:    *United States v. Jagtar Chadha*, 20 Cr. 512 (VB)

Dear Judge Briccetti:

     The Government respectfully submits this letter in advance of the sentencing of the defendant, Jagtar Chadha, scheduled for October 1, 2021.  As described below, the Government respectfully submits that a sentence within the Sentencing Guidelines range of 51 to 63 months' imprisonment would be sufficient but not greater than necessary to reflect the seriousness of the defendant's conduct, to promote respect for the law, to ensure adequate general and specific deterrence, and to prevent sentencing disparities.

     As further described below, for over three years, Chadha bought counterfeit electronic cigarettes from China and sold them at wholesale quantities in the United States.  And particularly after the United States began restricting sales of flavored electronic cigarette products, Chadha bought flavored electronic cigarettes that were only approved for distribution in Canada and sold them at wholesale quantities in the United States.  While there is no evidence that Chadha's products were harmful beyond the harm common to all electronic cigarettes, his evasion of the U.S. Food and Drug Administration's ("FDA") regulations and oversight put the public at risk, including teenagers who were particularly drawn to the flavored electronic cigarettes.  And Chadha's years-long disregard for the law and the risks to the public was all done out of greed.

     A Guidelines sentence is particularly appropriate here because not only is the conduct serious, but Chadha's repeated actions demonstrated an egregious disrespect for the law and underscore a serious need for specific deterrence.  Chadha committed this crime while he was ███████████████████████████████████████████, continued committing the crime after he was convicted of  conspiring to distribute synthetic cannabis, and after he was placed on supervised release.  And most alarmingly, Chadha's illegal conduct continued after his arrest in this case, after he came in to proffer with our Office, and while he was purporting to cooperate with our Office.

A.      **Factual Background**

Since at least 2012, Chadha owned and operated a company called DC Distributors USA d/b/a Cannaboys ("Cannaboys"), which had a store in Manhattan and a storage warehouse in Hicksville, New York.  PSR ¶ 9.  Cannaboys was a wholesale distributor of, among other things, CBD products, pills containing sildenafil, including Kamagra, and tobacco-related products, including electronic cigarettes, which purported to be JUUL Labs Inc. ("JUUL"), Logic Development LLC ("Logic") and Puff branded products, and contained the companies' respective logos.  *Id.*  As a wholesale distributor, Cahdha's direct customers purchased products in bulk and then sold the products to other distributors or companies that sold to the public through convenience stores and gas stations.  *Id.*

1.   Chadha Sold Counterfeit Logic Electronic Cigarettes for Years

Since at least 2016, Chadha began purchasing large-scale quantities of counterfeit electronic cigarette products from China that bore the registered trademarks of Logic and appeared indistinguishable from Logic's actual products.  PSR ¶ 12.  The electronic cigarettes were not authentic Logic products, however, and had not been approved by the FDA for distribution in the United States.  *Id.*  Chadha bought the counterfeit Logic products at prices far below the price for genuine Logic-branded electronic cigarettes and thereafter sold the counterfeit products in wholesale quantities through Cannaboys.  *Id.*  Chadha knew that the products were counterfeit and he knew that they would be sold to an unsuspecting public as legitimate Logic electronic cigarettes. *Id.*  Unlike the legitimate part of Chadha's business, Chadha sold the counterfeit Logic electronic cigarette products to customers almost entirely for cash and did not maintain clear books and records for these sales.  PSR ¶ 14.

Law enforcement's investigation began in May 2017, when the U.S. Customs and Border Protection intercepted a shipping container, which had approximately 14,000 counterfeit Logic liquid tobacco capsules for use in electronic cigarettes.  PSR ¶ 13.[1]  The shipment was from Hong Kong and was addressed to "JAG" and "DC Distributors" at the address for the Cannaboys' warehouse.  *Id.*

Law enforcement later began working with a confidential source (the "CS"), who conducted several controlled buys from Chadha.  For example, on November 14, 2018, June 5, 2019 and July 8, 2019, the CS purchased approximately $1,500 worth of counterfeit Logic electronic cigarette products from Chadha, with all such purchases done in cash.  PSR ¶ 14.

On August 2, 2019, Nassau County Police announced the arrest of three individuals charged with distributing counterfeit Logic electronic cigarette products and the seizure of approximately 10,000 counterfeit Logic e-cigarette products.  PSR ¶ 15.  A few weeks later, a Cannaboys employee told the CS that Chadha moved most of his Logic products to his home because of the recent arrests.  *Id.*  The employee further told the CS that Cannaboys would no

---

[1] Although law enforcement's investigation began in 2017, law enforcement was able to confirm that Chadha's sales began in at least 2016 because law enforcement identified communications between Chahda and his Chinese distributor regarding the sale of the counterfeit products.

longer use receipts for Logic electronic cigarettes and all such purchases would need to be in cash. *Id.*

On September 5, 2019, law enforcement searched the Cannaboys' store and warehouse, and Chadha's home and car, and obtained the following counterfeit Logic electronic cigarette products:  approximately 800 capsules from the store; approximately 200 capsules from the warehouse; and approximately 1,400 capsules from Chadha's car.  PSR ¶ 16.

A search of Chadha's phone revealed further evidence of Chadha's distribution of counterfeit electronic cigarettes and his knowledge that the products were counterfeit. For example, on August 23, 2016, one of Chadha's Chinese suppliers ("CC-1") stated "I will go visit the factory whom making the Logic.  I will give you price on tomorrow."  PSR ¶ 17.  The next day, Chadha asked CC-1 to send a sample for "what ever they are making," and "make sure new package."  *Id.*  In October 2016, Chadha paid CC-1 approximately $45,000 for shipments of counterfeit Logic electronic cigarettes.  *Id.*  Later that month, CC-1 told Chadha that some of the Logic electronic cigarettes he ordered were being held by the FDA and CC-1 asked whether they should use a different address for future shipments.  PSR ¶ 18.

In June 2017, another supplier of counterfeit Logic cigarettes ("CC-2") messaged Chadha, "I called factory they say the cheap material one disposable could sell $19 but they don t wanna make the bad quality one.  Will cause a lot of problem."  *Id.*  Chadha responded with an order for Logic electronic cigarette products.  *Id.*  In August 2019, another individual sent Chadha a link to a news article about the three individuals who had been arrested for selling counterfeit Logic electronic cigarette products in Nassau County.  *Id.*

Law enforcement interviewed current and former employees of Cannaboys who stated in sum and substance that Chadha told them that Cannaboys was selling fake Logic electronic cigarette products. PSR ¶ 19.

Overall, because Chadha purposefully failed to maintain records of his sales of counterfeit Logic electronic cigarettes, it is impossible to determine the precise amount that he sold, but law enforcement was able to verify that he received over $400,000 from the sales.  Had Chadha purchased authentic Logic products from Logic's manufacturers, it would have cost him over $1.5 million, which represents the loss to Logic as a result of Chadha's actions.  PSR ¶ 20.

2.  Chadha Sold Misbranded JUUL Cigarettes

During the June and July 2019 controlled buys described above, the CS also purchased approximately $786 worth of misbranded JUUL electronic cigarette products from Chadha.  PSR ¶ 21.  In addition, on September 5, 2019, law enforcement found approximately 2,200 capsules of misbranded JUUL electronic cigarette products in Cannaboy's store and warehouse.  *Id.*  The misbranded JUUL products were authentic, flavored JUUL products, however, they were only approved for distribution in Canada and their packaging did not comply with the Federal Food, Drug and Cosmetic Act ("FDCA") requirements for, among other things, the warning label for nicotine.  *Id.*  The reason Chadha sold the misbranded JUUL was because flavored electronic cigarettes were increasingly difficult to obtain in the United States due to the enhanced restrictions

imposed in the United States to try to stop teenagers from trying and becoming addicted to electronic cigarettes. *Id.* However, because of the high demand for the flavored products, including significant demand driven by teenagers, Chadha saw and exploited an opportunity to make money by purchasing JUUL from the black market in Canada and reselling the product in the United States.

In addition to the misbranded Canadian JUUL, law enforcement also found approximately $959 worth of counterfeit JUUL in the September 2019 search of Chadha's car.

   3.   Chadha Sold Misbranded Pills

In the controlled buys on June 5, 2019 and July 8, 2019, Chadha also sold 35 packets of Kamagra pills. PSR ¶ 25. Kamargra contains sildenafil citrate as an active pharmaceutical ingredient and is sold in India to treat erectile dysfunction, but is not approved for distribution in the United States. *Id.*

   4.   Chadha's Illegal Conduct Continued Following His Arrest

Following Chadha's arrest, the Eastern District of New York filed a violation of supervised release against Chadha because he committed the instant offense while on supervised release. PSR ¶ 11. Chadha also expressed an interest in cooperating with law enforcement immediately following his arrest. *Id.* At the first proffer with the Government, law enforcement warned Chadha that he would need to stop all sales of counterfeit or misbranded electronic cigarettes. PSR ¶ 23. Thereafter law enforcement had several more conversations with Chadha, who continued to maintain that he was interested in cooperating. *Id.* However, in the summer of 2020, law enforcement received information that Chadha was continuing to sell misbranded Canadian JUUL and had started to sell a new type of fake electronic cigarette product that purported to be Puff electronic cigarettes. PSR ¶ 24. In August 2020, law enforcement conducted a controlled buy wherein Chadha sold fake Puff electronic cigarette products[2] and misbranded Canadian JUUL products, which he was purposefully storing in a different location. *Id.* Given Chadha's ongoing illegal conduct, Chadha's initial attempts at cooperating did not meaningfully assist law enforcement's other investigations.

**B.**    **Procedural History**

On January 16, 2020, Chadha was charged by complaint with trafficking in counterfeit goods in violation of Title 18, United States Code, Sections 2320 and 2. Because Chadha expressed an interest in proactively cooperating, this matter was sealed. On September 29, 2020, Chadha appeared before U.S. Magistrate Judge Paul E. Davison and waived indictment and consented to the filing of a felony information, charging him with the same crime as set forth in

---

[2] These sales are considered misbranded as opposed to counterfeit because Puff had applied to the U.S. Patent and Trademark Office for trademark protections, but the trademarks had not been fully approved and registered at the time of the sale. In any event, Chadha was selling electronic cigarettes that had not been reviewed or approved for distribution in the United States.

the complaint.  ECF. Nos. 1-2.  On April 22, 2021, Chadha pled guilty before Your Honor pursuant to a plea agreement.

**C.      The Plea Agreement and the Applicable Guidelines Range**

The plea agreement between the defendant and the Government sets forth the parties' understanding of the appropriate sentencing Guidelines range of 51 to 63 months' imprisonment. As described below, the United States Probation Office ("Probation") calculated the same Guidelines range and recommends a sentence of 51 months' imprisonment.

The plea agreement stated that in addition to Chadha's trafficking in counterfeit Logic electronic cigarette products from 2016 to September 2019, as charged in Count One of the Information, Chadha agreed that the following conduct was relevant conduct under United Statements Sentencing Guidelines ("U.S.S.G") § 1B1.3(a)(2):  trafficking in counterfeit JUUL electronic cigarette products in September 2019; trafficking in misbranded JUUL electronic cigarette products from June 2019 to September 2019 and August 2020' trafficking in misbranded Puff electronic cigarette products in August 2020; and trafficking is misbranded drugs claiming to contain Sildenafil from June 2019 to September 2019.

The plea agreement further stipulated that pursuant to U.S.S.G. § 2B5.3, the base offense level is 8.  PSR ¶ 4(b).  Because the infringement and misbranded amount, including the relevant conduct, exceeded $1,500,000, but did not exceed $3,500,000, an additional 16 levels are added, pursuant to U.S.S.G. §§ 2B5.3(b)(1), 2B1.1(b)(1)(I), 2NC2.1(c)(1), 3D1.2(d) and 1B1.3(a)(2). PSR ¶ 4(c).  Because the offense involved the importation of infringing items, an additional two levels are added, pursuant to U.S.S.G. § 2B5.3(b)(3).  PSR ¶ 4(d).  Because the defendant accepted responsibility and entered a timely guilty plea, a three-level reduction applies, pursuant to U.S.S.G. § 3E1.1(a) and (b).  Accordingly, the base offense level is 23.  *See also* PSR ¶¶ 34-44.

On July 15, 2014, Chadha was convicted of conspiring to distribute synthetic cannabinoids and on September 6, 2018, was sentenced to time served and one-year supervised release, resulting in one criminal history point.  PSR ¶ 40.   Because the defendant committed the instant offense while on supervised release, an additional two points are added pursuant to U.S.S.G. § 4A1.1(d). Accordingly, the defendant has a total of three criminal history points and is in criminal history category II.  PSR ¶ 49.

With an offense level of 23 and criminal history category II, the sentencing Guidelines range is 51 to 63 months' imprisonment.

**D.      Discussion**

**1.  Applicable Law**

As the Court is well aware, the Sentencing Guidelines still provide strong guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005).  Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual

sentencing decisions," *Gall v. United States*, 128 S. Ct. 586, 594 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 596. After that calculation, however, the Court must consider the seven factors outlined in Title 18, United States Code, Section 3553(a), which include the nature and circumstances of the offense, the individual characteristics of the defendant, and the need to adequately deter criminal conduct and promote respect for the law. *Id.* at 50 & n.6.

### 2. A Guidelines Sentence Is Appropriate in This Case

The Government respectfully submits that a sentence within the Guidelines range of 51 to 63 months' imprisonment would be sufficient, but not greater than necessary, to achieve the legitimate purposes of sentencing. In particular, the nature and circumstances of the offense, the need to promote respect for the law, and the need to assure both general and specific deterrence, all justify such a sentence.

As described above, the nature of Chadha's offense is serious and involved selling large-scale, wholesale quantities of counterfeit and misbranded electronic cigarette products for years. Chadha had full knowledge that his actions were illegal and that the ultimate consumers would be innocent and unknowing American consumers. Not only was Chadha paying a price far below that of legitimate electronic cigarettes, but he knew that some of his purchases were intercepted by the U.S. Customs and Border Protection. In addition, Chadha was directing his Chinese distributors to use new packaging and the distributors raised concerns with him about using cheap and low-quality materials in their products. Chadha also handled his sale of counterfeit and misbranded electronic cigarettes very differently from the rest of his business. Unlike his sales of legal products, Chadha kept very few records of his sales of counterfeit and misbranded electronic cigarettes, only sold the products to select customers he thought he could trust, asked customers to pay in cash, and towards the end, stopped providing receipts. And when Chadha heard about others being arrested for selling similar counterfeit products, he did not stop selling the product, but rather moved the bulk of it to his car to try to avoid detection. And even when he was arrested in connection with the instant offense, he continued to sell misbranded JUUL, but began storing it in a new location, in a further attempt to avoid detection, and began selling a different type of fake electronic cigarette product.

While there is no evidence that anyone was harmed by Chadha's sales of counterfeit electronic cigarettes, beyond the harm common to all electronic cigarette products, Chadha's conduct was inherently dangerous as he was selling products that the FDA did not regulate or approve for distribution in the United States. Accordingly, given the unknown quality controls being done on these black-market products, Chadha's actions created a serious risk to innocent consumers. And with respect to Chadha's sale of misbranded JUUL electronic cigarette products, Chadha's actions sought to evade the restrictions on the sale of flavored electronic cigarette products. Yet these restrictions were instituted to reduce the alarming rate of teenagers becoming addicted to electronic cigarettes and thus incurring increased risks of serious health problems, including lug diseases.

Chadha's sales of Kamagra also created a risk to the public. Due to its toxicity and other potential for harmful effects, drugs like Kamagra are prescription drugs and therefore not safe for

use except under the supervision of a practitioner licensed by law to administer the prescription drugs. PSR ¶ 25. In addition to various side effects, drugs containing sildenafil citrate can be particularly harmful to persons taking heart medications containing nitrates because the active pharmaceutical ingredient can interact with the nitrates and lower blood pressure to dangerous levels. *Id.* Taken together, the seriousness of Chadha's offense is underscored by the fact that his actions were all motivated by pure greed. Chadha did not commit this offense out of financial desperation, he did it to make himself wealthier.

The need to promote respect for the law and ensure specific deterrence are further factors that weigh heavily in favor of a Guidelines sentence. Chadha did not simply make a one-time mistake; he committed the instant offense over a course of years. More troubling, is that not only did Chadha commit the instant offense ████████████████████████████ ██████████████████████ he continued the illegal conduct while on supervised release. And even more concerning, he continued similar conduct after his arrest in connection with the instant offense and while he was purporting to cooperate with our Office. Put simply, Chadha has plainly demonstrated that he believes he can act with impunity and that the laws simply do not apply to him. A Guidelines sentence is required to sufficiently deter Chadha from violating the law every time he sees an opportunity to make more money.

### 3. Defense Counsel's Submission

Defense counsel seeks a sentence of home confinement, probation and/or community service. In support, defense counsel submitted numerous letters from Chadha's family, friends and members of his community. While the Court can and should consider the love and support of Chadha's friends and family, the Government respectfully submits that given the other sentencing factors described above, this is an insufficient basis for a below Guidelines sentence. While Chadha may have shown generosity to some members of his community, his repeated actions here over the course of many years demonstrate a willingness to disregard the law and place innocent lives at risk so that he could enrich himself. And while Chadha's generosity to some members of his community is admirable, it further evidences that Chadha did not commit the instant offense out of financial desperation. Chadha chose to commit the instant offense out of greed and did so knowing that the consequences could include time in imprisonment that would separate him from his family and friends. Having previously been convicted in the Eastern District of New York, Chadha had full knowledge that his illegal sales exposed him to potential jail time, and yet he continued to violate the law. Indeed, Chadha continued his illegal conduct even after his arrest in this case, when he was facing a very real and serious risk of imprisonment.

Defense counsel claims that "there is little risk of recidivism and no need to protect the public from future crimes," because Chadha is 67 years old and is "extremely unlikely to recidivate." Br. at 16; *see also id.* at 21. The Government respectfully submits that Chadha's own actions in connection with the instant offense belie this argument. Chadha committed the offense when he was over 65 years old and continued selling misbranded products even after his arrest. Defense counsel's reliance on general statistics about the rate of recidivism for individuals over 65 years old is accordingly of little to no significance to this case. Defendant's own actions demonstrate that a sentence of home confinement, probation and/or community service will have little to no deterrence on the defendant's actions.

Defense counsel notes that Chadha has a history of several health challenges including a
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████. Br. 12-13.
The Government respectfully submits that defense counsel has not identified any health issue that
is currently causing Chadha any serious problems and does not identify anything which the Bureau
of Prisons would be unable to address and treat. With respect to COVID-19, defense counsel notes
that the defendant is vaccinated, but faces an increased risk from infection due to his age and
hypertension. However, the fact that the defendant is vaccinated substantially reduces his risks
from COVID-19 and the Government respectfully submits that his age and hypertension are not
sufficient factors to warrant a below-guidelines sentence. Furthermore, it should be noted that
Chadha chose to continue committing the illegal conduct during the pendency of this case, while
he was directly faced with the threat of imprisonment, and while the risks of COVID-19 were
much greater than they are today.

Finally, defense counsel claims that the Guidelines range overstates Chadha's offense
because of the "arbitrary 16-level enhancement." Br. at 22. Contrary to defense counsel's
argument, the enhancement is not arbitrary, but is the appropriate reflection of the enormous scale
of Chadha's illegal conduct, which took place over a course of years and involved large-scale
distribution of counterfeit and misbranded electronic cigarette products. If anything, the
Guidelines do not take into account the egregious nature in which Chadha disregarded the law time
and again, despite opportunities to cooperate and stop his illegal conduct.

**E.  Conclusion**

For the reasons set forth above, the Government respectfully requests that the Court impose
a sentence within the applicable Guidelines range of 51 to 63 months' imprisonment.

Very truly yours,

AUDREY STRAUSS
United States Attorney

by:  \_\_/s/ Courtney Heavey_____
       Courtney L. Heavey
       Assistant United States Attorney
       (914) 993-1927

---

[3] According to the CDC, a BMI of ████ is barely in the "overweight" category, which is defined
as a BMI over 25, and does not fall within the categories of obesity or severe obesity. Furthermore,
according to the CDC in 2017 to 2018, approximately 73.6% of adults over 20 were at least
overweight. https://www.cdc.gov/nchs/fastats/obesity-overweight.htm.